**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>450 5th Street, N.W., Suite 8700<br>Washington, D.C. 20530,<br><br>      *Plaintiff,*<br>v.<br><br>AMCOR LIMITED<br>Thurgauerstrasse 34<br>CH-8050, Zurich,<br>Switzerland<br><br>  and<br><br>BEMIS COMPANY, INC.<br>One Neenah Center<br>Neenah, WI 54957<br><br>      *Defendants.* | Civil Action No.: |

**COMPLAINT**

The United States of America ("United States"), acting under the direction of the Attorney General of the United States, brings this civil antitrust action against Defendants Amcor Limited ("Amcor") and Bemis Company, Inc. ("Bemis") to enjoin Amcor's proposed acquisition of Bemis. The United States complains and alleges as follows:

**I.   NATURE OF THE ACTION**

1.  Pursuant to a Transaction Agreement dated August 6, 2018, Amcor proposes to acquire all of the shares of Bemis for $6.8 billion, making the combined company the largest flexible packaging manufacturer in the world.  Hospitals rely on flexible medical packaging to

preserve the sterility of surgical tools, implants such as artificial hips, and a host of other medical devices. Improper packaging threatens the health of patients by allowing contamination from hazardous microbes and raises the cost of healthcare by exposing medical facilities to unnecessary risk.

2. In the United States, Amcor and Bemis are two of only three significant suppliers of three medical packaging products critical to the safe transportation and use of medical devices: heat-seal coated medical-grade Tyvek rollstock ("coated Tyvek"), heat-seal coated medical-grade paper rollstock ("coated paper"), and heat-seal coated medical-grade Tyvek die-cut lidding ("die-cut lids"). Tyvek is a spinbonded material made from high-density polyethylene fibers, while paper is made from cellulose fibers. Both coated Tyvek and coated paper are wound onto a roll ("rollstock") for easy transport and later conversion into finished medical packaging. Pouches and bags made from coated Tyvek, for example, are used to package surgical kits and cardiac catheters, while coated paper pouches and bags are used to package gauze and other wound care products. Coated Tyvek also is a necessary input to die-cut lids when the lids are used by medical device manufacturers to package and transport heavy, expensive, sharp, or bulky devices such as implants or pacemakers.

3. The proposed acquisition will eliminate competition between Amcor and Bemis to supply these products to customers and likely lead to increased prices. As a result, the proposed acquisition likely would substantially lessen competition in the development, production, and sale of coated Tyvek, coated paper, and die-cut lids for medical use in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II. THE PARTIES

4. Amcor, a global packaging manufacturer, is organized under Australian law and is headquartered in Zurich, Switzerland. In 2018, Amcor had total sales of over $9 billion, including approximately $288 million in sales of flexible packaging for medical use in the United States.

5. Bemis, a global packaging manufacturer, is a Missouri corporation headquartered in Neenah, Wisconsin. In 2018, Bemis had total sales of over $4 billion, including approximately $260.9 million in sales of flexible packaging for medical use in the United States.

## III. JURISDICTION AND VENUE

6. The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7. Defendants themselves, or through wholly-owned subsidiaries, produce and sell coated Tyvek, coated paper, and die-cut lids in the flow of interstate commerce. Defendants' activities in the development, production, and sale of these products substantially affect interstate commerce. This Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8. Defendants have consented to venue and personal jurisdiction in this District. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c).

## IV. INDUSTRY BACKGROUND

9. Medical flexible packaging protects medical devices from dangerous microbes and particulates that can cause medical complications and risk patient safety. Medical devices

used every day in hospitals, medical offices, and labs—ranging from a patient's gown to a syringe or an orthopedic implant—are sterilized after they have been packaged and must remain that way until use.  With lives potentially at stake if a sterile barrier fails, flexible packaging manufacturers use complex chemical engineering and substantial manufacturing know-how and expertise to make their packaging products.

10.     Of the many materials available to make medical flexible packaging, two—medical grade paper and Tyvek—are each necessary for packaging certain medical devices.  Both products can be sold in rollstock form, or as a "converted," or finished, packaging product, such as a die-cut lid, a bag, or a pouch.

11.     Unlike any other medical flexible packaging materials, Tyvek and medical grade paper are compatible with all methods of medical device sterilization, including sterilization by ethylene-oxide gas ("EtO"), which requires a "breathable," or porous, package.  To limit the risk of contamination, medical devices are sterilized after they are packaged, and the most common way to sterilize a medical device is with EtO.  Tyvek and paper allow EtO gas to enter and exit while maintaining a sterile barrier.  Other breathable materials have been developed, but no other breathable material is currently used to package medical devices.

12.     Tyvek often is preferred by medical device manufacturers over any other flexible packaging material because it is extremely durable.  Once packaged and sterilized, medical devices are transported to hospitals, labs, or doctors' offices and stored until use.  During transport and storage, medical device manufacturers rely on a device's packaging to withstand rough handling and preserve a sterile barrier.  Because Tyvek is the most tear and puncture resistant medical flexible packaging material on the market, it is frequently used to protect bulky, heavy, or expensive devices such as hip implants and other orthopedics.

13. Medical device manufacturers require a heat-seal coating to be applied to Tyvek and paper when those materials are used to package certain medical devices or in conjunction with certain medical packaging conversion equipment.  Developing a coating formula and perfecting the application of coating to Tyvek or paper is complicated and requires substantial know-how and expertise.  Coatings are trade secrets and difficult to engineer and replicate.  If a coating is not applied properly, a package's seal can fail, rendering the medical device inside hazardous to use.

14. When a medical device is used in a medical procedure, a number of risks arise that can compromise a device's function or sterility.  Heat-seal coatings reduce the risk of contamination because they ensure that Tyvek and paper peel cleanly from the remainder of the package and do not generate particulates when opened.  If the package is not easy to open, a medical professional could drop the device, touch it inadvertently, or cause it to touch the outside of the package or something else that is not sterile.  Alternatively, if, at the time of opening, the packaging material releases particulates, those particulates can contaminate the device.

15. Coatings also may make certain seals between different materials possible.  For example, hip implants are normally packaged in rigid trays with die-cut lids made of Tyvek that are cut to match the shape of the tray.  Because of the combined durability of a rigid tray and coated Tyvek, the pairing often is preferred for packaging expensive, heavy, or unusually-shaped medical devices. Sealing Tyvek to a rigid tray, however, is not possible unless the Tyvek is coated.  A coating may also make it possible for sealing to occur at a broader range of temperatures, which makes coatings particularly important for medical device manufacturers or converters with older equipment.

16.   The Food and Drug Administration has established strict regulatory standards for evaluating, selecting, and using medical packaging materials.  Medical device manufacturers have an obligation to ensure that their medical flexible packaging meets these standards, which requires qualification of the conditions in which a product will be manufactured and validation of the packaging's forming, sealing, and assembly processes.

17.   Before a packaged medical device goes to market, the medical device manufacturer must qualify the packaging supplier's facilities, raw materials, and manufacturing line.  Additionally, the combination of device and packaging must be validated by the medical device manufacturer.  The validation process requires numerous tests, including quality testing, sterilization testing, seal-strength testing, real-time aging simulations, and shipping and handling simulations.  These safeguards protect patients from hazardous microbes, bacteria, or particulates that can breach the package's sterile barrier during transport, storage, or opening.

18.   Qualification and validation of new packaging for a medical device can take years to complete and cost thousands of dollars.  Even small changes to an existing package can necessitate requalification or revalidation.

## V.   RELEVANT MARKETS

### A. Product Markets

#### a. Heat-Seal Coated Medical-Grade Tyvek Rollstock

19.   Heat-seal coated medical-grade Tyvek rollstock ("coated Tyvek") is a properly defined relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

20.   There are no substitutes for coated Tyvek for certain packaging applications.  Uncoated Tyvek lacks the peelability, sealability, and particulate control of coated Tyvek and

does not adhere to a rigid tray. Medical-grade paper in coated or uncoated form also generally is not a substitute for coated Tyvek because medical-grade paper lacks the same degree of durability that Tyvek delivers.

21. In the event of a small but significant non-transitory price increase for coated Tyvek, customers would not substitute away from coated Tyvek in sufficient volume so as to render the price increase unprofitable.

### b. Heat-Seal Coated Medical Grade Paper Rollstock

22. Heat-seal coated medical-grade paper rollstock ("coated paper") is a properly defined relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

23. There are no substitutes for coated paper for certain packaging applications. Uncoated paper lacks the peelability and particulate control of coated paper. Tyvek rollstock in coated or uncoated form also generally is not a substitute for applications that rely upon coated paper, because the price of Tyvek is so much higher than the price of coated paper that a customer would not switch to Tyvek even considering Tyvek's superior durability.

24. In the event of a small but significant non-transitory price increase for coated paper, customers would not substitute away from coated paper in sufficient volume so as to render the price increase unprofitable.

### c. Heat-Seal Coated Tyvek Die-Cut Lids

25. Heat-seal coated Tyvek die-cut lids ("die-cut lids") are a properly defined relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

26. There are no substitutes for die-cut lids when used for certain applications. Uncoated materials are not substitutes for die-cut lids because coating is necessary for a lid to

adhere to a rigid tray. Similarly, lids made of paper are not a substitute for die-cut lids because paper lids lack the same degree of durability as Tyvek.

27. In the event of a small but significant non-transitory price increase for die-cut lids, customers would not substitute away from die-cut lids in sufficient volume so as to render the price increase unprofitable.

### B. Geographic Market

28. The relevant geographic market for each of the relevant product markets is the United States. Producers of the relevant products can target customers based on their locations. Due to shipping costs and unique specifications there is no ability to arbitrage. Therefore, the relevant geographic market for each relevant product market is defined as sales made to customers in the United States.

## VI. ANTICOMPETITIVE EFFECTS

29. The proposed acquisition of Bemis by Amcor likely would substantially lessen competition for U.S. customers the three relevant product markets. Amcor, Bemis, and one other company are the three primary competitors in each of these markets. The Defendants' combined share is over 70% in coated Tyvek and coated paper, and over 50% in die-cut lids.

30. Market concentration is a useful indication of how rigorous competition is in a market and whether a transaction is likely to cause competitive effects. Concentration in relevant markets is typically measured by the Herfindahl-Hirschman Index (or "HHI"). Markets in which the HHI is in excess of 2,500 points are considered highly concentrated. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* ¶ 5.3 (revised August 19, 2010) ("Merger Guidelines"), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010.

31. As demonstrated in the table below, which is based on Defendants' 2017 revenues, each of these markets is highly concentrated and would become significantly more concentrated as a result of the proposed acquisition.

| Market | Pre-Acquisition HHI | Post-Acquisition HHI | HHI Delta |
| --- | --- | --- | --- |
| Coated Tyvek | 3300 | More than 5800 | 2500 |
| Coated Paper | 3900 | 8000 | 4200 |
| Die-Cut Lids | 3600 | 4900 | 1300 |

32. The proposed acquisition leads to an increase in the HHI of more than 200 points in each of these product markets, making the acquisition presumptively harmful under the Horizontal Merger Guidelines.

33. The transaction also eliminates head-to-head competition between Amcor and Bemis and threatens the benefits that customers have realized from that competition in the form of lower prices and better service. Due to Amcor and Bemis's collective overall expertise in meeting the needs of customers and other technical and commercial factors, including among other things, price, quality, and the ability to pass each customer's rigorous qualification and validation procedures, Amcor and Bemis are frequently viewed by each other and by customers as two of the three most significant competitors in the market.

34. Amcor and Bemis competed against each other to win business, and they proposed pricing and products to customers that reflected an awareness of that competition. As a result, the ability of each company to raise prices, reduce quality, or limit technical support services to Medical Device Manufacturers has been constrained by the possibility of losing business to the other. For many customers, Amcor and Bemis are their two best substitutes. By eliminating Bemis as a competitor, Amcor likely would gain the incentive and ability to increase

its bid prices, reduce quality, and reduce technical support below what it would have been absent the acquisition.

35. Customers have benefitted from competition between Amcor and Bemis through lower prices and higher quality. The combination of Amcor and Bemis would eliminate this competition and future benefits to customers and likely would result in harmful unilateral price effects.

## VII. ENTRY

36. Entry is unlikely to prevent or remedy the acquisition's likely anticompetitive effects. Entry into the development, production, and sale of the foregoing relevant products is costly and unlikely to be timely or sufficient to prevent the harm to competition caused by the elimination of Bemis as an independent supplier.

37. Barriers to entry include the significant technical expertise required to design a coating and production process that satisfies customer requirements. A new supplier would first need to develop and produce a heat-seal coating sufficient to meet the rigorous standards set by potential customers. The supplier would then need to develop a system to apply the coating to meet customers' rigorous standards. In addition, the technical know-how necessary to pass customers' qualification tests is difficult to obtain and is learned through a time-consuming trial-and-error process.

38. Even after a new entrant has developed the necessary capabilities, the entrant's product must be qualified and validated by potential customers, demonstrating that its products can meet rigorous quality and performance standards. These qualification and validation requirements discourage entry by imposing substantial costs on potential suppliers with no

guarantee that their products will be successful in the market. They also take substantial time—in some cases, years—to complete.

## VIII. VIOLATIONS ALLEGED

39. The acquisition of Bemis by Amcor is likely to lessen competition substantially in each of the relevant markets set forth above in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

40. The transaction will likely have the following anticompetitive effects, among others:

   a. actual and potential competition between Amcor and Bemis in the relevant markets will be eliminated;

   b. competition generally in the relevant markets will be substantially lessened; and

   c. prices in the relevant markets will likely increase.

41. The United States requests that this Court:

   a. adjudge and decree Amcor's acquisition of Bemis to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

   b. enjoin Defendants and all persons acting on their behalf from consummating the proposed acquisition of Bemis by Amcor or from entering into or carrying out any other agreement, plan, or understanding the effect of which would be to combine Amcor with Bemis;

   c. award the United States its costs of this action; and

   d. grant the United States such other relief as the Court deems just and proper.

Dated: MAY 30, 2019

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____
MAKAN DELRAHIM (D.C. Bar #457795)
Assistant Attorney General
Antitrust Division

_____
ANDREW C. FINCH (D.C. Bar #494992)
Principal Deputy Assistant Attorney General
Antitrust Division

_____
BERNARD A. NIGRO, JR. (D.C. Bar #412357)
Deputy Assistant Attorney General
Antitrust Division

_____
PATRICIA A. BRINK
Director of Civil Enforcement
Antitrust Division

_____
MARIBETH PETRIZZI (D.C. Bar #435204)
Chief
Defense, Industrials, and Aerospace Section
Antitrust Division

_____
STEPHANIE A. FLEMING
Assistant Chief
Defense, Industrials, and Aerospace Section
Antitrust Division

_____
REBECCA VALENTINE* (D.C. Bar #989607)

JEREMY CLINE (D.C. Bar #1011073)
STEVEN A. HARRIS
SAMER MUSALLAM
JOHN LYNCH (D.C. Bar #418313)

Defense, Industrials, and Aerospace Section
Antitrust Division
450 Fifth Street N.W., Suite 8700
Washington, D.C. 20530
Telephone (202) 598-2844
Facsimile (202) 514-9033

* Counsel of record

# CIVIL COVER SHEET

JS-44 (Rev. 6/17 DC)

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington D.C. 20530

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **11001**
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Amcor Limited
Thurgauerstrasse 34
CH-8050, Zurich
Switzerland

Bemis Company, Inc.
One Neenah Center
Neenah, WI 54957

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **99999**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Rebecca Valentine
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530
(202) 598-2844

ATTORNEYS (IF KNOWN)

Joseph Krauss
Counsel for Amcor Limited
Hogan Lovells US LLP
555 13th St. N.W.
Washington, D.C. 20004

Stephen Wu
Counsel for Bemis Company, Inc.
McDermott Will & Emery
444 W Lake St. #4000
Chicago, IL 60606

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and **one** in a corresponding Nature of Suit)

### ○ A. *Antitrust*

- [X] 410 Antitrust

### ○ B. *Personal Injury/Malpractice*

- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Medical Malpractice
- [ ] 365 Product Liability
- [ ] 367 Health Care/Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Product Liability

### ○ C. *Administrative Agency Review*

- [ ] 151 Medicare Act

**Social Security**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**Other Statutes**
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. *General Civil (Other)* OR ○ F. *Pro Se General Civil*

**Real Property**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**Personal Property**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**Bankruptcy**
- [ ] 422 Appeal 27 USC 158
- [ ] 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Conditions
- [ ] 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent – Abbreviated New Drug Application
- [ ] 840 Trademark

**Federal Tax Suits**
- [ ] 870 Taxes (US plaintiff or defendant)
- [ ] 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**Other Statutes**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation

- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions
- [ ] 470 Racketeer Influenced & Corrupt Organization
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 850 Securities/Commodities/Exchange
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/Privacy Act* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi-district Litigation ○ 7 Appeal to District Judge from Mag. Judge ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Section 7 of the Clayton Act, 15 U.S.C. § 18 - Merger that substantially lessens competition.

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|
| VIII. RELATED CASE(S) IF ANY | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form |

DATE: 5/30/2019    SIGNATURE OF ATTORNEY OF RECORD *Rebecca Valentine*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI. CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.